IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DENNIS SADDLER**, <br>         Plaintiff, <br> v. <br> **ELLIOTT COMPANY**, <br>         Defendant. | CIVIL ACTION NO. 07-1320 <br><br> JUDGE JOY FLOWERS CONTI |

## MEMORANDUM OPINION

CONTI, District Judge.

Pending before the court is a motion for summary judgment (Doc. No. 18) filed by plaintiff Dennis Saddler ("Saddler"), and a motion for summary judgment (Doc. No. 20) filed by defendant Elliott Company ("Elliott"). Saddler brought this civil action for benefits allegedly due pursuant to section 502 of the Employee Retirement and Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Saddler is seeking benefits due pursuant to the Elliott Company Severance Plan (the "Plan"), which is funded and administered by the employer, Elliott, and governed by ERISA. After consideration of the parties' submissions and arguments the court will deny the motion for summary judgment filed by Saddler, and grant the motion for summary judgment filed by Elliott for the reasons set forth herein.

## STIPULATED FACTS

The relevant facts of the case are not in dispute, and the parties stipulated to the following facts for purposes of their summary judgment motions:

Saddler is a participant in the Plan which is administered pursuant to the terms of the Plan and section 402 of ERISA (Joint Statement of Facts ("Facts") ¶ 1.) Saddler was employed at Elliott during two different time periods. (Id. ¶ 2.) On September 30, 2003, Saddler was employed in Elliott's Plant Air Packaging Group (the "PAP Group") as a project engineer and worked with the PAP Group in Elliott's Building 45 ("Building 45"). (Id. ¶¶ 3-4.)

On September 5, 2003, Elliott, as the seller, entered into an asset purchase agreement (the "Purchase Agreement") with F.S. Elliott Co. ("F.S. Elliott"), as the buyer, pursuant to which F.S. Elliot would purchase certain assets of Elliott, mainly the assets of the PAP Group (the "sale"). (Id. ¶ 5.) Article 11 of the Purchase Agreement outlined the provisions of the transfer of the PAP Group employees from Elliott to F.S. Elliott. (Id. ¶ 6.) The Purchase Agreement defined employee transfer as follows:

> [I]n respect of any PAP salaried employee selected by the Buyer at its sole discretion, the termination of his/her employment with the Seller and his/her subsequent employment with the Buyer, whereby such PAP salaried employee's prior years of service with the Seller would be recognized by the Buyer for the purposes of vacation eligibility only, with no continuation of employment or pension benefits existing as of the Closing Date to be required of or assumed by the Buyer, and subject to the indemnification provisions related to such capital or transfers set forth in the Capital Agreement; and when used as a verb, shall have the similar import.

(Id. ¶ 7.) Article 11.1.2 of the Purchase Agreement provided:

> Effective as of 12:01 a.m. on the first Business Day after the Closing Date (the "Effective Time"), PAP salaried employees who have been selected for employment by the Buyer at its sole discretion shall be Transferred to the Buyer with such employment to be either 'at will' or pursuant to Employment Agreement; and any such Employment Agreements or employment relationships entered into between the Buyer and such relevant PAP salaried employees shall become effective…. It is the intention of the Parties that the Buyer shall not be required, by law (as between the

2

> Parties) or otherwise, to assume, continue, contribute to, or otherwise participate in any manner in the Seller's existing benefit plans, and thus shall not be required, by law (as between the Parties), or otherwise, to assume or otherwise be responsible for the Seller's liabilities whether existing or future under such benefit plans.... The Seller shall retain all obligations and liabilities in respect of all benefits accrued and obligations owed to such capital employees, including but not limited to any outstanding wages, unused vacation leave, employee loans, pension benefits, post-retirement medical insurance benefits, life insurance benefits, flexible benefit plans, that may have accrued or have been accrued prior to the Closing Date in accordance with Schedule 11.1.2 attached hereto and made a part hereof.

(Id. ¶ 8.) Elliott completed the sale to F.S. Elliott on October 1, 2003, and F.S. Elliott continued the operations of the PAP Group in Building 45. (Id. ¶ 9.)

Prior to the sale, Elliott's managers held general meetings with the employees of the PAP Group that were being transferred to F.S. Elliott. During these meetings, the transfer-eligible employees of the PAP Group were told that they were not being laid off. (Id. ¶ 10.) The Elliott managers leading these meetings never stated that the sale of the PAP Group or the transfer of the PAP employees to F.S. Elliott occurred because of a decline in business or a technology improvement. (Id. ¶ 11.) On October 1, 2003, Saddler, along with numerous other employees of the PAP Group, was transferred to F.S. Elliott as part of the sale. (Id. ¶ 12.)

After the sale, the PAP Group employees who had been transferred to F.S. Elliot, including Saddler, continued working out of Building 45, pursuant to a lease agreement between Elliott and F.S. Elliott. (Id. ¶ 13.) After the sale, Saddler worked at F.S. Elliott, as he had at Elliot, as a project engineer in Building 45. (Id. ¶ 14.) After the sale, Saddler sat at the same desk, in the same location in Building 45, and had the same telephone number. (Id. ¶ 15.) Saddler had the same job responsibilities and duties that he had prior to the sale. (Id. ¶ 16.) Saddler's salary either stayed the same or was slightly increased after the transfer. (Id. ¶ 17.)

After the sale, Elliott laid off three PAP Group employees who were not transferred to F.S. Elliott. These three employees, Jim Hudson, Rick Dillon, and Albert Walczak, were paid severance pay benefits pursuant to the Plan. (Id. ¶ 18.)

While employed at F.S. Elliott, Saddler elected to begin collecting his unreduced retirement benefits from Elliott's pension plan in January 2004. (Id. ¶ 19.)

The Plan allowed payment of severance pay benefits only at Elliott's discretion and only if an employee lost his or her job for one of the following three reasons: (a) a decline in business; (b) a plant closing; or (c) a technology improvement. (Id. ¶ 20.) The Plan provided in relevant part:

> Severance pay is given as compensation to an employee who has lost his/her job because of a decline in business, plant closing or technology improvement. It is paid at the company's discretion and only for the above reasons.
> ***
> Wherever possible, an employee will be given a two-week notice before the effective date of his/her layoff.

(Id. at Ex. 5.) Elliott pays employees who are eligible for severance pay benefits one week's salary for every two years of service, with a minimum total amount of two weeks' salary. (Id. ¶ 21.)

Saddler resigned from F.S. Elliott in March 2004, five months after the transfer. (Id. ¶ 22.) At the time Saddler resigned, he was working out of Building 45, doing the same duties and responsibilities, working at the same desk, and using the same phone number that he used prior to his transfer to F.S. Elliott. (Id. ¶ 23.)

On September 5, 2006, more than two years after his resignation and almost three years from his transfer to F.S. Elliott, Saddler requested payment of severance pay benefits from

4

Elliott. (Id. ¶ 24.) On September 29, 2006, Elliott denied Saddler's claim for payment of severance pay benefits. (Id. ¶ 25.) On November 28, 2006, Saddler appealed Elliott's denial of his request for severance pay benefits. (Id. ¶ 26.) In his appeal letter, Saddler alleged that his "job with Elliot [sic] Company was eliminated due to the plant closure/sale to F.S.-Elliot [sic] Co," despite the fact that Saddler was continuously employed until his March 2004 resignation. (Id. ¶ 27.) Elliott denied Saddler's appeal on January 5, 2007, claiming that Saddler did not lose his job under the terms of the severance pay policy and that the PAP Group plant where Saddler was employed was never closed. (Id. ¶ 28.)

## STANDARDS OF REVIEW

### I. SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party"). The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

## II. APPLICABLE ERISA STANDARD OF REVIEW

The first step in determining the merits of the parties' cross-motions for summary judgment is determining what standard of review governs the Plan's denial of benefits. When reviewing a benefit determination by a plan administrator or a fiduciary of a benefit plan pursuant to section 1132(a)(1)(B) of ERISA, a district court should be "'guided by principles of trust law,'" and analogize the plan administrator to the trustee of a common-law trust. Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2347 (2008)(quoting Firestone Tire & Rubber Co. V. Bruch, 489 U.S. 101, 111 (1989)). In Firestone, the United States Supreme Court held that courts must review a denial of ERISA benefits under a de novo standard of review unless the "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone, 489 U.S. at 115; see Romero v. SmithKline Beecham, 309 F.3d 113, 118 (3d. Cir. 2002). If the administrator has discretionary power, "[t]rust principles make a deferential standard of review appropriate" and "the trustee's

interpretation will not be disturbed if reasonable." Firestone, 489 U.S. at 111; see Romero, 309 F.3d at 118; Mitchell v. Eastman Kodak Co., 113 F.3d 443, 437 (3d Cir. 1997). If the administrator has discretionary power, courts are to apply an arbitrary and capricious standard of review. See Mitchell, 113 F.3d at 439.

The United States Court of Appeals for the Third Circuit concluded that this standard is "essentially the same as the 'abuse of discretion' standard." Abnaytha v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 n.4 (3d Cir. 1993). The court of appeals stated with respect to the "arbitrary and capricious" standard:

> [A]n administrator's decision will only be overturned if it is "without reason, unsupported by substantial evidence, or erroneous as a matter of law . . . . [T]he court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits."

Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3d Cir. 2000) (quoting Pinto v. Reliance Standard Life Ins. Co., 156 F.3d 1225 (3d Cir. 1998)(decision without published opinion, opinion available on docket at No. 97-5297, May 28, 1998)). Stated in other words, a board's interpretation of its pension plan "is entitled to deference under the arbitrary and capricious standard, unless it is contrary to the plain language of the plan." Skretvedt v. E.I. DuPont de Nemours and Co., 268 F.3d 167 (3d Cir. 2001).

If the plan administrator is operating under a conflict of interest, however, the conflict must be weighed as a factor in determining whether there has been an abuse of discretion. Metropolitan Life Ins. Co., 128 S. Ct. at 2348. When the plan administrator is the employer who both funds the plan and makes benefit determinations, as in this case, the plan administrator is operating under a conflict. Id. As in trust law, in the case of a conflicted fiduciary, the court must "apply a deferential standard of review to the discretionary decision making of a conflicted

7

[fiduciary], while at the same time . . . take account of the conflict when determining whether the [fiduciary], substantively or procedurally, has abused his discretion." Id. at 2350.

## DISCUSSION

The Plan provides for payment of severance benefits "to an employee who has lost his/her job because of a decline in business, plant closing or technology improvement." (Facts Ex. 5.) Saddler contends that his transfer constituted losing his job, because he no longer had his job with Elliott, and he lost all his benefits from Elliott. Saddler maintains that the sale to F.S. Elliott was considered a plant closing, because Elliott no longer operated a plant at the location. Elliott - to the contrary - claims that Saddler did not lose his job, because he was given the same job, with the same or slightly higher pay at the same location with F.S. Elliott. Elliott further argues that there was no plant closing, because F.S. Elliott continued to run a plant at the same location. There is no definition of "lost his/her job" or "plant closing" in the Plan.

With respect to reviewing a board's discretionary interpretation of its own ERISA plan, the United States Court of Appeals for the Third Circuit has developed an analytical framework to guide courts in determining whether the board's decision was arbitrary and capricious. The first step in the analysis is to determine whether the terms of the plan documents in dispute are ambiguous. Bill Gray Enterprises, Inc. Employee Health and Welfare Plan v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001). The determination whether an ERISA plan provision is ambiguous is a question of law requiring plenary review by the court. See Int'l Union, UAW v. Mack Truck, Inc., 917 F.2d 107, 111 (3d Cir. 1990). If the court determines that the specific language at issue is unambiguous, "then any actions taken by the plan administrator inconsistent with the terms of the document are arbitrary." Id. Actions are not arbitrary if they are "reasonably consistent" with the unambiguous language of the plan. Id. If the court determines that the specific plan language

at issue is ambiguous, however, "it must take the additional step and analyze whether the plan administrator's interpretation of the document is reasonable." Id.

Traditional rules of contract construction apply to employee benefits plans governed by ERISA. Televantos v. Lyondell Chem. Worldwide, 31 F. App'x 63, 66 (3d Cir. 2002)(citing Int'l Union, UAW v. Skinner Engine Co., 188 F.3d 130, 138 (3d Cir.1999)); see In re Unisys Corp. Long-Term Disability Plan ERISA Litig., 97 F.3d 710, 715 (3d Cir.1996). A contract is ambiguous if it is subject to reasonable alternative interpretations. Taylor v. Cont'l Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1232 (3d Cir.1991). To determine whether a particular clause in a plan document is ambiguous, the court must first look to the plain language of the document. Bill Gray Enterprises, 248 F.3d at 218. In determining whether a clause in a contract is ambiguous, the court is not, however, confined to the four corners of the agreement, and may look to the context under which the agreement was made. Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999). In Bethlehem Steel Corp. v. United States, 270 F.3d 135 (3d Cir. 2001), the Court of Appeals for the Third Circuit discussed this process:

> We have stated that "[t]o decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear.... [W]e consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning."

Id. at 139 (quoting Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993) (citations omitted)).

In this case, the court must determine whether the phrases "plant closing" and "job loss" are ambiguous under the terms of the Plan. There was no evidence presented concerning the

bargaining history or previous conduct of the parties to help inform the court's understanding of the contract terms. The parties, however, presented extrinsic evidence surrounding the interpretation of the Plan pursuant to the sale, and subsequent transfer of PAP Group Employees that the court will consider in construing the contract terms. The court will first consider whether the phrase "plant closing" is ambiguous.

### *Plant Closing*

At first glance the phrase "plant closing" seems clear, straightforward and unambiguous. Plant closing means the plant closed. The parties argue, however, plant closing as it is used in the Plan could have more than one meaning. Saddler's counsel suggests that a plant closing under the terms of the Plan includes the situation here where the plant which Elliott operated for years is no longer operated by Elliott. In that circumstance, the party that agreed to pay under the terms of the severance agreement no longer employs any one or operates a plant at the location. Saddler's proposed interpretation is reasonable given the conduct of the parties reflecting their understanding of the agreement. The Plan explicitly limits the events that trigger severance pay to the following three events: (1) a decline in business; (2) a plant closing; or (3) a technology improvement. Elliott concedes that the sale of the PAP Group was not due to a decline in business or a technology improvement. Nevertheless, Elliott made severance payments pursuant to the Plan to three employees who were not hired by F.S. Elliott as a result of the sale. The only remaining trigger permitted under the plan is a plant closing. Elliott, therefore, had to have interpreted the sale of the PAP Group as a plant closing with respect to the employees who were not retained. Saddler's suggested interpretation of the asset sale as a plant closing is consistent with the relevant conduct of the parties pursuant to the Plan, and is a reasonable interpretation.

Elliott suggests that a plant closing only includes the closing of the plant at that particular location regardless of the entity operating the plant, and suggests that the sale was not a plant closing. This interpretation is inconsistent with Elliott's conduct under the Plan. Elliott treated the sale as a plant closing with respect to the three employees who were not hired by F.S. Elliott. Elliott now claims with respect to Saddler that the very event that triggered severance payments under the Plan for the non-transferred employees was not a qualifying event. There is no rational basis in this case to treat the very same event one way with respect to some PAP Group employees and another way with respect to other PAP Group employees. Under these circumstances, Elliott's interpretation of a plant closing with respect to Saddler is unreasonable.

*Job Loss*

The court next considers whether the phrase "an employee who has lost his/her job" is ambiguous under the terms of the plan. Saddler contends that this phrase includes any employee who no longer has his or her job with Elliott. Elliott maintains that this phrase only includes employees who became unemployed as a result of the sale to F.S. Elliott. As will be discussed, both those interpretations are reasonable and the court finds the phrase ambiguous. Bethlehem Steel, 207 F.3d at 139.

There are extrinsic facts that support Saddler's interpretation of the Plan to include "transferred" employees as employees who lost his or her job. Pursuant to the purchase agreement, all "transferred" PAP Group employees had their employment with Elliott terminated, and were subsequently rehired by F.S. Elliott. F.S. Elliott had sole discretion which employees of Elliott, if any, to rehire. There is no evidence of record that F.S. Elliot was required to rehire any employees of Elliott. F.S. Elliott was not responsible for any benefits of Elliott employees. Elliott remained liable for any benefits. After being rehired by F.S. Elliott,

employees stopped accruing service time for calculation of any pension or retirement plan with Elliott. F.S. Elliot rehired all but three of Elliott's PAP group employees. There is no requirement in the Plan that an employee fail to gain new employment after being terminated by Elliott in order to be eligible for severance pay. Given these facts, Saddler's interpretation of the Plan is reasonable.

On the other hand, the Plan contemplated that severance payments are to be made to those employees who are laid off. The Plan provided: "[w]herever possible, an employee will be given a two-week notice before the effective date of his/her layoff." (Facts Ex. 5.)(emphasis added). Saddler was among the employees who were told they were not being laid off. (Facts ¶ 10.) There are also extrinsic facts that support Elliott's interpretation of the Plan to exclude employees who were transferred to F. S. Elliot. After the sale, Saddler missed no work and continued working in the same building at the same desk. Saddler's job title of project engineer was the same with F.S. Elliott as it was with Elliott. In his job with F.S. Elliott, Saddler sat at the same desk, in the same location in Building 45, and had the same telephone number as he had with Elliott. Saddler had the same job responsibilities and duties that he had prior to the sale. Saddler's salary either stayed the same or was slightly increased after the transfer. Under those circumstances, the court concludes that Elliott's interpretation of the Plan as it applied to Saddler was reasonable, and considering that the language of the Plan contemplated only laid off employees would receive benefits this interpretation is arguably more reasonable than the interpretation suggested by Saddler.

When there are two reasonable interpretations as here, the contract language is ambiguous. Bethlehem Steel, 207 F.3d at 139. When the language is ambiguous, the inquiry is whether the plan administrator, who has discretion under the Plan and a potential conflict, is required to follow the interpretation that is most favorable to the employee or may exercise discretion to

follow either reasonable interpretation. No decisions requiring the plan administrator to find in favor of the employee in such a situation were cited by the parties or found by the court. If the plan administrator under the terms of the plan has discretion to construe the terms of the Plan, even where a conflict is a factor, than a plan administrator faced with equally reasonable interpretations should not always be constrained to follow the interpretation most favorable to the employee. Otherwise, there would not be any discretion. Denying the ability to exercise discretion would be even more problematic in a case like that here where the most reasonable interpretation favors the employer. The court does not address the situation where the most reasonable interpretation favors the employee.

Given the discretion given to Elliott in the Plan, the court can not conclude that Elliott's interpretation of the phrase "job loss" in the plan was arbitrary or capricious. There are no facts of record - other than the potential conflict itself - that any potential conflict of interest influenced Elliott's decision or otherwise caused Elliott substantively or procedurally to abuse its discretion.

## **CONCLUSION**

For the reasons stated above the court concludes that Elliott's denial of severance benefits to Saddler was not arbitrary or capricious. Accordingly, summary judgment will be granted in favor of Elliott and against Saddler.

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

cc: Counsel of Record